CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED
APR 0 8 2008
JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TONY BERNARD MARTIN, | ) | |
|     Petitioner, | ) | Civil Action No. 7:08-cv-00249 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| GENE JOHNSON, DIRECTOR OF | ) | |
| THE VIRGINIA DEPARTMENT OF | ) | By: Hon. James C. Turk |
| CORRECTIONS, | ) | Senior United States District Judge |
|     Respondent. | ) | |

    Tony Bernard Martin, a Virginia inmate proceeding pro se, brings this action as a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Martin challenges the validity of his confinement under the August 27, 2002 judgment of the Chesterfield County Circuit Court and Chesterfield, Virginia, convicting him of breaking and entering, grand larceny, and violation of probation. Upon consideration of the petition, the court is of the opinion that it should be dismissed summarily pursuant to Rule 4 of the Rules Governing §2254 Cases. A petition may be dismissed under this rule if it is clear from the petition that the petitioner is not entitled to relief.

## I.

    Under 28 U.S.C. § 2254(b), a federal court cannot grant a habeas petition unless the petitioner has exhausted the remedies available in the courts of the state in which he was convicted. Preiser v. Rodriguez, 411 U.S. 475 (1973); Slayton v. Smith, 404 U.S. 53 (1971). The exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. See Va. Code § 8.01-654(A); O'Sullivan v. Boerckel, 119 S. Ct. 1728 (1999). Martin filed a state habeas petition directly with the Supreme Court of Virginia that was dismissed as frivolous by order entered January 9, 2008. Martin asserts that all of his current federal habeas claims were presented to the Virginia Supreme Court in the state habeas proceedings and that he

thereby exhausted his state court remedies; however, he does not provide the court with a copy of his state habeas petition.[1] Martin filed his federal habeas petition on March 24, 2008.

To the extent that the Supreme Court of Virginia addressed Martin's current claims on the merits, the United States District Court cannot grant federal habeas corpus relief unless it finds that the Supreme Court of Virginia's disposition of the claims was contrary to, or an unreasonable application of, established federal law, as determined by the Supreme Court of the United States, or is based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d)(1). Martin complains that he "did not receive a full, fair, and adequate hearing in the State court proceedings" and contends that his petition "was dismissed as frivolous without considering the merits of the factual issues presented." (Pet. at 2.) However, the decision from the Supreme Court of Virginia, though it cites no legal analysis or precedent in support of its disposition, is an adjudication on the merits and is entitled to the deference mandated in § 2254(d). See Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000). A federal habeas court reviewing such a state court decision must uphold that decision unless, after conducting independent review, it is clear that the result reached by the state court "contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of facts in light of the evidence presented." Id. (internal citation omitted).

## II.

Martin complains in his petition that he was "removed from work release after he had entered into a signed agreement with the Department" and that this ultimately resulted in the loss of "earned

---

[1] To the extent that the Martin did not present all of his current claims to the Supreme Court of Virginia, the court may address the claims on the merits and dismiss them, pursuant to 28 U.S.C. § 2254(b)(2).

sentence credits" without the benefit of due process. (Pet. at 3.) Specifically, Martin explains that on October 16, 2002, he was received into the Virginia Department of Corrections ("VDOC") when he was transported to the James River Correctional Center ("JRCC") in State Farm, Virginia. An institutional treatment plan for Martin was established on June 6, 2003. A portion of that plan, Martin's "needs assessment," indicated that Martin had no health, behavioral or emotional problems, and no issues with drug or alcohol abuse. (Pet. at 3., Ex. 1.) The plan also recommended that Martin enroll and participate in the vocational program of his choice. It was also noted that Martin should obtain and maintain employment with above average work ratings and that he should remain infraction free. Martin contends that he fulfilled all of the goals set forth in his institutional treatment plan. Martin alleges that he entered the VDOC earning sentence credits at a Class Level II ("ESC Class Level"), but that he was approved for ESC Class Level I on October 1, 2004, due to his success with his treatment plan.

Martin's October 25, 2005 institutional classification authority ("ICA") hearing form at JRCC indicated that he had no institutional infractions, that he requested a transfer to an institution closer to his daughter, that he was to remain at an ESC Class Level I, that his security level was reduced from a Level II to a Level I, that he had maintained excellent adjustment, and that he had been assigned to an honor dorm without incident. Martin contends that he "fulfilled his treatment objections" and was, therefore, transferred at some unspecified date to the Rustburg Correctional Unit #9 in Rustburg Virginia (Unit #9). (Pet. at 5.) Subsequent to his transfer, Martin was considered and approved for a work release program. His July 10, 2006 hearing form indicates that he was to "remain in a DOC facility pending final review and approval of the jail administrative authority." (Pet. at 5, Ex. 6.) On August 10, 2006, Martin signed a document titled "Conditions of

3

Agreement" concerning the "Jail Contract Bed (JCB) Work Release" program. (Pet. at 5, Ex. 7.) The document assigned Martin to the Charlotte County Jail for participation in the work release program and Martin contends that was merely "awaiting transfer upon bed availability." (Pet. at 5.)

Martin contends that, prior to his transfer, he chipped a tooth and requested dental treatment. Due to limited facilities, he explains that the "practice" of Unit #9 was to transfer inmates to Botetourt Correctional Center ("BCC") in Troutville, Virginia to receive dental treatment. (Pet. at 5.) Martin was, accordingly, transferred to BCC on December 5, 2006, as a "medical transfer only." (Pet. at 5.) Martin alleges that he did not receive an ICA hearing concerning his potential "removal" from the work release program. Martin further complains that staff at BCC instituted a new treatment plan for him on December 12, 2006. This time, it was noted that, according to Martin's pre-sentence investigation report, he had alcohol and drug abuse problems. It was also determined that if "Martin is found to qualify," he "will need to participate" in the Substance Abuse Therapeutic Community ("SATC") program. (Pet. at 6, Ex. 9.) Martin contends that he refused to sign this document because his approval for the work release program was not noted and he contested that he suffered from any alcohol or drug abuse prior to or subsequent to his incarceration. Martin alleges that he was then informed that he would be transferred to the Charlotte County Jail when bed space was available, but that he might have to participate in the SATC program until then. Martin agreed and attempted to gain employment at BCC while he was waiting on his transfer.

Martin was ultimately hired and "worked outside the gate as a Security Level I employee." (Pet. at 7.) After seven weeks, however, Martin complained that he had never received a paycheck. Martin was informed that he would not be paid unless he was participating in the SATC program. Martin contends that "[w]hile attempting to speak with someone in administration about the

4

situation," he received three disciplinary charges."[1] (Pet. at 7.) Martin alleges that he was informed that he would be paid for the work that he completed but that the fines that he incurred "essentially wiped out his paycheck and he would get nothing." (Pet. at 7.) On March 13, 2007, Martin was informed that he would have to enter the SATC program. Martin argued that he was supposed to be transferred soon to participate in the work release program and that he had signed a contract verifying this. Subsequent to the meeting, Martin contends that he was falsely charged with a disciplinary offense that he did not commit, but that the offense was ultimately dismissed due to "administrative error."[2] (Pet. at 8, Ex. 16.)

Martin contends that he continued to "remain outside the [SATC] program" and that he was not allowed to work during this time. (Pet. at 8.) On April 10, 2007, however, Martin alleges that "the administration continued its campaign of writing charges on [him] in an attempt to make him comply with their wish that he enter the [SATC] program." (Pet. at 8.) Specifically, Martin received charges for refusing to cut his hair or shave and for refusing to get out of bed during a morning head count. Martin was placed in the SHU as punishment for these charges. On April 12 and 13, 2007, Martin was charged with refusing to leave the SHU and to participate in the "SATC Program." (Pet. at 9, Ex. 21-22.) He alleges that the charges were retaliatory in nature and complains that he had not been provided with an ICA hearing to determine whether he was qualified to participate in the SATC program or whether he was removed from the work release program.

---

[1] Disciplinary offense reports provided by Martin reveal that offenses occurred on February 7, 2007 and included disobeying a direct order on two occasions and being in an unauthorized area. Martin was allegedly fined $24.00 and given three days isolation in the Special Housing Unit ("SHU") for these offenses.

[2] The March 13, 2007 disciplinary offense report indicates that Martin was given a direct order to attend a required SATC program meeting in the "TC dorm" but that he refused. Martin contends that he never received such an order.

5

On April 19, 2007, Martin received an ICA hearing to determine his "proper housing assignment." (Pet. at 10, Ex. 23.) It was assessed that Martin was "no longer considered a threat to the orderly operation of [the] institution" and released back in to the general population. (Pet. at 10, Ex. 23.) Martin began participating in the SATC program because it was "the only way to avoid getting pointless and unfounded charges." (Pet. at 10.) However, Martin contends that his relationship with the administrative staff continued to be "contentious" and complains that he received disciplinary charge for vulgar or insolent language directed toward an employee on May 10, 2007. Specifically, the disciplinary offense report indicates that Martin called Assistant Warden Paul J Rice a "liar and a joke" in front of several other inmates. (Pet. at 10, Ex. 25.) In the process of preparing Martin for pre-hearing detention resulting from the May 10, 2007 incident, an officer found several items of contraband, which also resulted in a disciplinary charge. At the May 15, 2007 ICA hearing concerning these two disciplinary charges, it was recommended that, due to Martin's disruptive behavior, he be assigned to the SHU, that his ESC level be raised to a Level IV, that his security level be raised to a Level II, that he be removed from the SATC program, and that he be transferred. Martin remained in the SHU until he was transferred to the Pulaski Correctional Center in Dublin, Virginia at some unspecified date.

### III.

Martin's main complaint appears to be that he was not provided with an opportunity to participate in the work release program, despite having signed what he contends is a contract confirming his participation in the program. However, inmates have no constitutional right to job opportunities while incarcerated and an inmate's expectation of gaining or keeping a specific prison job, or any job, does not implicate a protected constitutional right. See, e.g., Gibson v. McEvers, 631

F.2d 95, 98 (7th Cir. 1980). Courts of Appeals consistently have held that an inmate's expectation of keeping a specific prison job does not implicate a protected liberty interest. See, e.g., Kitchen v. Upshaw, 286 F.3d 179, 186-187 (4th Cir. 2002) (finding that the plaintiff had not been deprived of any liberty interest when prison officials refused to allow him to participate in a work-release program even though the sentencing order had stated that he may participate in such a program if eligible); Coakley v. Murphy, 884 F.2d 1218, 1221 (9th Cir. 1989) (holding that inmates have no protected property interest in continuing in work-release program). Since inmates have no independent constitutional right to a prison job, prison officials may generally terminate an inmate from his job for any reason without offending federal due process principles. See Bulger v. United States Bureau of Prisons, 65 F.3d 48, 49 (5th Cir. 1995) (applying Sandin v. Conner, 515 U.S. 472, 484 (1995) (a prisoner's liberty "interests will be generally limited to the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life")). Because Martin had no legal expectation of starting or maintaining employment with the work release program, his failure to begin or the loss of that job does not implicate any federal due process principles; as such, he had no federal right to notice or a hearing before he was terminated from the program.[3, 4, 5] Thus, any due

---

[3] Two sources give rise to a protected liberty interest: the Due Process Clause and the laws of the individual states. Brandon v. District of Columbia Board of Parole, 823 F.2d 644, 647 (D.C. Cir. 1987) (citing Hewitt v. Helms, 459 U.S. 460, 466 (1983)). To the extent that Martin alleges that the laws of Virginia create a protected liberty interest in the work release program, his claims must fail. It is clear that Virginia's work release statute does not create any constitutionally protected liberty interest; thus, any imperfections in the process by which an inmate is denied work release do not state any federal due process claims. See Gaston v. Taylor, 946 F.2d 340, 344 (4th Cir. 1991); see also Callender v. Sioux City Residential Treatment Facility, 88 F.3d 666, 669 (8th Cir. 1996) (revocation of prisoner's work release program was not atypical or significant deprivation in relation to ordinary prison life, and thus there was no state-created liberty interest in remaining in work release program such that would entitle him to due process of law before that privilege was
(continued...)

7

process claims related to the work release program fail and must be dismissed.

Martin further appears to complain that his security level was raised and that his ESC level was raised. However, there is not a protected liberty interest in a particular security classification or in remaining in or being assigned to a particular good conduct allowance class level. See Hewitt v. Helms, 459 U.S. 460, 468 (1983) (prisoners do not have a constitutionally recognized liberty interest in a particular security classification); Slezak v. Evatt, 21 F.3d 590 (4th Cir. 1994) (the federal Constitution itself vests no liberty interest in inmates in retaining or receiving any particular security or custody status as long as challenged conditions or the degree of confinement is within sentence imposed and is not otherwise violative of Constitution); Hamm-Bey v. Johnson, Civil

---

[3](...continued)
revoked). Moreover, even if a state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue. See Riccio v. County of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir. 1990); Brandon, 823 F.2d at 648 (the "mere fact that the [state] government has established certain procedures does not mean that the procedures thereby become substantive liberty interests entitled to federal constitutional protection under the Due Process Clause"). In that same vein, the court notes that it declines to exercise supplemental jurisdiction over any related state law claims, including any state law contract claims, pursuant to 28 U.S.C. § 1367(c).

[4] To the extent that Martin conclusively alleges that the "termination" from the work release program was a violation of the Fourteenth Amendment's Equal Protection Clause, such a claim fails. To establish an equal protection violation, a plaintiff must first demonstrate that he or she has been "treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination;" once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. See Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001); see also Castaneda v. Partida, 430 U.S. 482, 493 (1977); Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977). Because Martin has not alleged any of the requisite conditions to a cognizable claim, any equal protection claim fails.

[5] To the extent that Martin complains that he was transferred to BCC for too long of a period, the court notes that he has no independent constitutional right to be housed in any particular prison within the VDOC system. Meachum v. Fano, 427 U.S. 215, 224 (1976) (holding that a valid conviction "empower[s] the State to confine [an inmate] in *any* of its prisons"). Further, Virginia's prison housing assignment regulations do not create a liberty interest in a specific prison housing assignment and prison officials have broad discretion to determine the facility where an inmate is housed. Id.; see also Gaston, 946 F.2d at 343 (noting that prison officials should be granted broad discretion in managing prisons safely and effectively). Therefore, Martin's due process rights were not implicated by his housing assignment unless the conditions of his confinement diverged so substantially from expected prison conditions as to create an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (1995). Martin does not adequately allege that the conditions at BCC imposed an atypical and significant hardship on him in relation to the ordinary incidents of his life in prison. The court notes that any claim that Martin may have concerning his ultimate transfer to the Pulaski Correctional Center fails for the same reason. Thus, a liberty interest is not implicated and any claims related to housing transfers must be dismissed.

8

Action No. 7:05cv00559, 2005 WL 2563029, at *2 (W.D. Va. Oct. 11, 2005) (finding that a move to a new security level and coinciding limits to inmate's potential to earn good conduct credit does not trigger federal due process protections); James v. Robinson, 863 F. Supp. 275 (E.D. Va. 1994) (inmates in Virginia have no protected liberty interest in earning good conduct allowances); Ewell v. Murray, 813 F. Supp. 1180, 1183 (W.D. Va. 1993) ("Neither [relevant Department of Prison procedures] nor the Virginia Code creates a liberty interest in being placed in any particular [good conduct allowance classification] or in earning any particular number of credits"). Regardless, it appears that Martin did receive an ICA hearing on May 15, 2007, in which his security level and ESC level were reviewed and modified and Martin fails to complain of any specific procedural protections that he was not afforded at the May 15, 2007 ICA hearing.[6,7] Accordingly, any due process claims related to Martin's security classification or ESC level fail and must be dismissed.

## IV.

In conclusion, the court finds that Martin's allegations fail to present any federal constitutional claims. Accordingly, the court cannot find that the Supreme Court of Virginia's

---

[6] The court notes that Martin alleges that being prohibited from participating in the work release program has caused him to "lose sentence credits"; however, it appears that Martin is not contending that he actually lost previously earned sentence credits, but that he lost the ability to accrue sentence credits at a certain rate. The Supreme Court has mandated procedural safeguards when the loss of statutory good time credits is at issue, specifically, 1) advance written notice of charges; 2) written findings; and 3) the right to call witnesses. Wolff v. McDonnell, 418 U.S. 539 (1974). Even if an inmate has a liberty interest in previously earned credits, the Constitution does not prohibit the state from depriving the inmate of that liberty interest; it simply mandates procedural due process prior to the deprivation. However, this situation does not appear to present a case in which the complained-of action "will inevitably affect the duration of his sentence." See Sandin, 515 U.S. at 487; see also Bulger, 65 F.3d at 50. Accordingly, no liberty interest is at issue here. However, even if Martin did lose earned sentence credits and was entitled to certain protections under Wolff, he fails to complain of any specific procedural protections that he was not afforded at the May 15, 2007 ICA hearing. Thus, such a claim is insufficient.

[7] To the extent that Martin complains that he was forced to participate in the SATC program, that he was charged with disciplinary infractions in retaliation for his lack of participation or to force him to participate in the program, or that he did not receive a paycheck because he was not in the program, the court finds that these issues are not clearly stated as separate claims.

9

disposition of Martin's claims was unreasonable, and the court must dismiss Martin's petition. An appropriate final Order will be entered this day.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion and final Order to petitioner.

**ENTER**: This 8th day of April, 2008.

/s/ James C. Turk
Senior United States District Judge

10